(C. D. 552)

Boyle Manufacturing Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided November 17, 1941)

*Lawrence & Tuttle* (*George R. Tuttle* and *Charles F. Lawrence* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Richard H. Welsh, Richard F. Weeks,* and *Joseph E. Weil*, special attorneys), for the defendant.

Before Walker and Cline, Judges

Walker, Judge: This protest is directed against the refusal of the collector of customs at the port of Los Angeles to allow drawback, under section 313 of the Tariff Act of 1930, of 99 per centum of the duties paid on the importation of merchandise claimed to have been used in the manufacture of steel drums which were exported.

None of the facts of importation or manufacture of the goods claimed to have been used in the exported articles are in question,

nor is there any dispute that the drums in question actually were exported. The sole reason for disallowing drawback, and the issue to which the protest is limited, is failure on the plaintiff's part to comply with the provisions of article 1023 of the Customs Regulations of 1931, then in force and effect, and which read as follows:

Art. 1023. Notice of intent to export.—Local or direct exportation from a seaboard or frontier port.—(a) At least six hours, but not more than 90 days, before the lading of the merchandise to be exported, the claimant for drawback, or his duly authorized agent, shall file with the collector of customs at the port of exportation a notice of intent to export in duplicate on customs Form 7511. A third copy of the notice of intent shall be delivered to the customs officer in charge at the place of lading at the time the goods are delivered to the exporting vessel or conveyance. Such notices of intent shall give the name of the exporting vessel, or in the case of a vehicle the name of the carrier, and place of lading, describe the merchandise by marks and numbers and state in detail the kind and contents of the packages, the quantity, weight (gross and net), gauge, or measure.

(b) On receipt and acceptance at the customhouse of the notice of intent, the collector shall note thereon the date and hour of receipt and transmit one copy to the surveyor, or to the customs officer in charge at the place of lading, with the order to inspect and the other copy to the Comptroller of Customs.

In this connection the record shows the following facts: Out of a lot of 2,185 drums delivered to the wharf at which the export vessel lay there were 1,845 claimed to have been made with the use of imported duty-paid material on which drawback was intended to be claimed. They were delivered to the wharf and lading of the vessel began at 8 a. m. on Saturday, May 15, 1937. The original notice of intent on Form 7511 was filed with the collector of customs at 10:45 a. m. on that day, but, probably because it was Saturday and a half-holiday, it was not delivered by the collector's office to the inspector at the place of lading until 10:50 a. m. on Monday, May 17, 1937. It appears that the lading of the drums went on from 8 a. m. May 15 until 6 a. m. May 16, the ship working under night order. The duplicate notice of intent called for by article 1023, *supra*, was not delivered to the inspector until 10 a. m., May 18, 1937. It will thus be seen that the inspector received no notice, either from the collector's office or from the shipper, that the drums were drawback merchandise until long after lading had been completed. Consequently, he did not inspect the packages nor were they laden under his supervision. In accordance with article 1033 of the Customs Regulations of 1931 the inspector, in making his return on the back of the notice of intent, reported that the merchandise had not been inspected by him nor laden under his supervision because the notice of intent was not received until after the ship was laden—

but that the records of the Parr Terminal Corporation show that packages of similar description were laden on the New Zealand for Australia on May 15/16/37 at various hours 8 a. m. May 15 or 6 a. m. May 16/37.

Article 1034 of the Customs Regulations then in effect provided as follows:

Art. 1034. Failure to file notices of intent—Local shipments.—The failure to file a timely notice of intent with the collector, in accordance with the provisions of article 1023, shall not bar the payment of drawback, provided a notice of intent is delivered to the inspecting officer as required, nor shall failure to deliver a copy of the notice of intent to the inspecting officer bar the payment of drawback, provided a timely notice of intent was filed with the collector, and provided, further, that no other act or omission on the part of the shipper, the carrier, or the agent of either, resulted in the failure to secure inspection.

From the foregoing it is apparent that the failure to deliver a duplicate of the notice of intent to the inspector at the place of lading at the time the drums were delivered to the exporting vessel does not militate against the payment of drawback provided a timely notice of intent was filed in the collector's office.

The question then presented is, was the notice filed in the collector's office timely, at least as to part of the merchandise exported? We are of the opinion that it must be considered to have been timely as to such portion of the drums as were laden after 4:45 p. m. on May 15, 1937, i. e., those that were laden more than 6 hours after the notice of intent was filed in the collector's office. This complies with the letter of the statute and also, we believe, with the spirit of the same, since the 6-hour period is doubtless intended to permit the collector's office to perform such clerical work as may be necessary in connection with the notice of intent and to deliver the same to the inspector in charge at the place of lading in the ordinary course of business.

The only question remaining to be decided is, how many of the drums were laden after the 6-hour period had expired? No count was made nor were any records kept from which the actual number of drawback drums laden after 4:45 p. m. on May 15 might be computed. However, certain facts do appear of record which assist in arriving at a fair result. As hereinbefore stated, the ship loaded a total of 2,185 drums and 20 cartons, or a total of 2,205 units, including the 1,845 drawback drums, in 18¼ hours from 8 a. m. May 15, or an average of 120 units per hour. From 8 a. m. to 4:45 p. m. represents 7¾ working hours, since no work was apparently done during the noon hour. 7¾×120= 930 units laden up to 4:45 p. m., leaving 1,275 units to be laden after that time. There is nothing to indicate precisely how many of these latter were drawback drums, but the following additional information aids in making a fair computation: The order of port loading was apparently that the packages for Adelaide, Australia, should be laden first, then in order those of Melbourne, Sydney, Brisbane, and Fremantle. The record shows that of 145 drums destined for Fremantle 40 were drawback drums, that of 210 drums destined for Brisbane 200 were drawback drums, and that of 790 drums destined for Sydney

720 were drawback drums. This makes a total of 1,145 drums, of which 960 were drawback drums. Since the drums for the three ports last named were to be laden last, and at 4:45 p. m., according to the calculation 1,275 drums remained to be laden, it is a fair inference that the 1,145 drums for those ports had not been laden at 4:45 p. m., and we hold the plaintiff is entitled to recover drawback on the 960 drums included in that figure.

It is obvious that the foregoing is based upon an average loading rate of 120 units per hour, which may or may not have been the actual rate for any given hour. For that reason we feel compelled to say that it is only after a careful review of the entire record that we are constrained, under a sense of justice, to order allowance of drawback for the 960 drums which the evidence discloses, at least inferentially, and it remains uncontradicted, were laden after 4:45 p. m. on May 15, 1937, after the expiration of the 6-hour period when notice to the collector was effective. However, it should be stressed that the instant case cannot be taken as a letdown of the bars or a waiver in any sense of the notice required under the provisions of the regulations, since the regulations in that regard are reasonable and mandatory and should and must be complied with as a condition precedent to obtaining relief.

It is impossible to determine from the record before us whether the 130 drums remaining of the 1,275 units which were laden after 4:45 p. m., and which are not accounted for in the above figures, were drawback or nondrawback units. There were 165 drawback drums bound for Adelaide and 720 drawback drums bound for Melbourne. These figures total 885, and it is obvious that they could all have been laden in the period between 8 a. m. and 4:45 p. m., since 930 units in all were, on the basis of 120 units an hour, laden in that time. On the record as presented there are not sufficient facts before us on which to base a finding in plaintiff's favor for all or any of such drums, and the protest must be overruled insofar as it applies to them.

Judgment will therefore issue directing the collector to allow drawback on the 960 drums above mentioned, but the protest is overruled in all other respects.